**CRAWFORD COUNTY, ARKANSAS, Plaintiff,**

v.

**Margaret HECKLER, Secretary of the United States Department of Health and Human Services, Defendant.**

**Civ. No. 85–2092.**

United States District Court, W.D. Arkansas, Fort Smith Division.

Feb. 18, 1986.

H. Clay Robinson, Pryor, Robinson & Barry, Fort Smith, Ark., N.D. Edwards, Van Buren, Ark., Charles R. Ledbetter, Shaw, Ledbetter, Hornberger, Cogbill & Arnold, Fort Smith, Ark., for plaintiff.

Mark W. Webb, Asst. U.S. Atty., Fort Smith, Ark., for defendant.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

This is an action arising under the Hill-Burton Act, 42 U.S.C. § 291i, to determine the propriety of the prospective recovery of grant assistance received by the Crawford County Hospital under Title VI of the Public Health Service Act and the Accelerated Public Works Act. The case was tried to the court on December 18, 1985.

The evidence indicates that on February 15, 1950, Crawford County, Arkansas, (Crawford County) was awarded a grant pursuant to Title VI of the Hill-Burton Act for the construction of a 52-bed general hospital. The total cost of this project was $577,924.93, of which $321,214.85 was the total federal grant share. The hospital opened on July 18, 1951.

On December 12, 1963, Crawford County was awarded a supplemental funding grant pursuant to the Accelerated Public Works Act of 1962, 42 U.S.C. §§ 2641 *et seq.*, for further construction at the hospital. The total cost of this project was $16,024.60, of which the total federal contribution was $11,012.30. This construction was completed on April 1, 1964.

On March 5, 1968, Crawford County was awarded a three-part grant for additions to and renovations of the hospital. The total cost of these projects was $1,897,919.15, of which $999,608.75 was the federal share. The expanded and renovated facilities opened on May 1, 1970.

Prior to the lease which "triggered" the asserted right of recovery of the funds, the hospital was leased to and operated by the Sisters of the St. Scholastica Convent of Fort Smith, a benevolent association and non-profit corporation. Early in 1981, St. Scholastica reported financial difficulties with the hospital operation.

It was ascertained by Crawford County that the hospital was in severe financial difficulty and that the buildings and equipment were in poor condition. Because of these problems, only limited medical care could be provided. The Crawford County Quorum Court decided that Humana Medical Centers, Inc., (Humana) could provide the best health care at the hospital. Humana is a for-profit corporation and it is agreed that it is an ineligible entity under the Hill-Burton Act (*see* § 609 of the Public Health Service Act).

On December 16, 1981, a lease agreement was executed between Crawford County and Humana, effective February 2, 1982. The United States Department of Health and Human Services (HHS) was informed of the lease by the Arkansas Department of Health pursuant to 42 C.F.R. § 53.134. Crawford County Judge George Willmuth was notified of the pending recovery claim on September 27, 1983, July 18, 1984, and January 9, 1985.

On April 30, 1984, the lease was assigned to Republic Health Corporation and HHS was so notified by letter dated January 23, 1985, from Humana.

The pertinent provisions of the Hill-Burton Act which authorize recovery actions, 42 U.S.C. § 291i, state that if

any facility with respect to which funds have been paid under section 606 [42 U.S.C. *291f] shall, at any time within 20 years after the completion of construction or modernization—*

(1) *be sold or transferred to any entity (A) which is not qualified to file an application under section 605 [42 U.S.C. § 291e],* or (B) which is not approved as a transferee by the State agency designated pursuant to section 604 [42 U.S.C. § 291d], or its successor, or

(2) cease to be a public health center or a public or other nonprofit hospital, outpa-

tient facility, facility for long-term care, or rehabilitation facility,

*the United States shall be entitled to recover, whether from the transferor or the transferee* (or, in the case of a facility which has ceased to be public or nonprofit, from the owners thereof) *an amount determined under subsection (c).*

\*　　\*　　\*　　\*　　\*　　\*

(d)(1) *The Secretary may waive the recovery rights of the United States under subsection (a)(1) with respect to a facility in any State if the Secretary determines, in accordance with regulations, that the entity to which the facility was sold or transferred—*

(A) *has established an irrevocable trust*—(i) *in an amount equal to the greater of twice the cost of the remaining obligation of the facility under clause (2) of section 603(e) [42 U.S.C. § 291c(e)(2)], or the amount, determined under subsection (c), that the United States is entitled to recover, and*

(ii) *which will only be used by the entity to provide the care required by clause (2) of section 603(e);* and

(B) *will meet the obligation of the facility under clause (1) of section 603(e) [42 U.S.C. § 291c(e)(1)].*

(2) The Secretary may waive the recovery rights of the United States under subsection (a)(2) with respect to a facility in any state if the Secretary determines, in accordance with regulations, that there is good cause for waiving such rights with respect to such facility. (Emphasis supplied).

Thus, because it is undisputed that Crawford County was paid funds under section 291f for construction projects and that within 20 years of completion of the projects it leased the hospital to a for-profit corporation, *i.e.*, Humana, the only issue remaining with regard to the right of recovery is whether the lease to Humana constitutes a "transfer" within the meaning of the Hill-Burton Act.

Consideration for the lease included an initial payment of $2,500,000 to Crawford County, a payment of $775,000 due on the sixth anniversary of the lease, and sums necessary to retire certain revenue bonds in the amount of $213,000 during the second through fifth years of the lease. Humana was to be responsible for all repairs to the hospital. Humana was to be similarly responsible for real and personal property taxes and insurance. Humana could cancel the lease only during the 30-day period beginning on the fifth anniversary of the lease and ending 30 days thereafter. The lease granted Humana an absolute and irrevocable right of first refusal to purchase the hospital. Humana was obligated to expend at least $2,800,000 on the hospital during the first three years of the lease.

It was agreed that Humana would provide 24-hour emergency room service and treatment for all life-threatening emergencies regardless of ability to pay for the services. Indigent care was to be provided only to residents of Crawford County, and only so long as there were funds in the Indigent Care Fund.

All medical affairs of the hospital were to be administered by a Board of Trustees in accordance with Board by-laws. The hospital corporation selected the trustees and it is the trustees that oversee compliance with the Joint Commission on Accreditation of Hospitals. Written reports were to be submitted to the Crawford County Board of Governors four times per year and the hospital administrator was required to be available on an annual basis to report to the Board of Governors. The Board of Governors is the body required by state law. Crawford County specifically assumed all potential Hill-Burton Act liability.

The Board of Trustees by-laws explicitly state: "The Corporation retains the ultimate authority and responsibility for the conduct of the hospital." An Executive Committee consisting of the officers of the Board of Trustees and the hospital Chief of Staff had the power to exercise all authority delegated to the Board of Trustees be-

tween meetings of that board. It was the Corporation (Humana) who was responsible for the selection and employment of the Executive Director responsible for the management of the hospital. This Executive Director had the following authority and duties:

(a) to carry out all policies established by the Trustees and the Corporation;

(b) to develop and submit to the Regional Vice President for approval, a plan of organization of the personnel and others concerned with the operation of the Hospital;

(c) to prepare an annual operating budget showing the expected receipts and expenditures;

(d) to select, employ, control and discharge employees, and develop and maintain personnel policies and practices for the Hospital;

(e) to maintain the physical properties in a good state of repair and operating condition;

(f) to supervise the business affairs of the Hospital;

(g) to cooperate with the Medical Staff and with all those concerned with rendering professional services, to the end that quality care will be rendered to the patients;

(h) to present to the Trustees or its authorized committee, periodic reports reflecting the professional service and financial activities of the Hospital and prepare and submit special reports as may be required by the Trustees and the Corporation;

(i) to attend all meetings of the Board of Trustees and committee thereof;

(j) to serve as the liaison officer and channel of communications for all official communications between the Trustees or any of its Committees, the Medical Staff and the Corporation;

(k) to review all inspection reports of any authorized inspecting agency and to insure that the Hospital meets the standards of JCAH accreditations and other appropriate accreditation and standard requirements;

(*l*) to perform other duties that may be necessary in the best interests of the Hospital; and

(m) in the absence of the Executive Director, the Associate Executive Director will perform the duties of the Executive Director.

[1] Although the lease contained numerous other provisions, from the above it is indisputable that for the large monetary consideration paid by Humana, Humana received virtually complete, if not total, control of all aspects of the hospital and management thereof. It is also immediately apparent that the lease did not require Humana to satisfy the same requirements that the Hill-Burton Act imposed. *See* 42 C.F.R. Part 124, subparts F and G. For example, there is no language incorporating the community service requirements of the regulations. *See* 42 C.F.R. §§ 124.-603(a), 124.507J(a), 124.506(b). Therefore, the court has no hesitancy in concluding that the lease constitutes a prohibited "transfer" within the plain language of the Hill-Burton Act and within the intended congressional scope of the Act. Accordingly, the court has no alternative but to hold that HHS is entitled to the recovery sought.

■ The court finds that the Reproduction Cost Method, as applied to projects numbers 120–HB and 120–APW, allows the government recovery of $36,846 for those projects. This was computed as follows:

| | |
|---|---|
| Total Cost of Project | $16,225 |
| Federal Share of Project (HB Grant) | 2,012 |
| Federal Share of Project (APW Grant) | 9,000 |
| HB Percentage | 12.4 % |

| | |
|---|---|
| APW Percentage | 55.47% |
| Total Federal Percentage | 67.87% |

Depreciation Factor

| | |
|---|---|
| 30 year life | = 360 mos. |
| Months in Use | = 214 mos. |

Depreciation:     $\frac{214}{360} = 59.44\%$

| | |
|---|---|
| Reproduction Cost (1,680 sq.ft. at $79.67/sq.ft.) | $133,846 |
| Depreciation (59.44% × $133,846) | 79,558 |
| Depreciated Then-Value ($133,846 − $79,558) | 54,288 |
| Recovery (HB) ($54,228 × 12.4%) | 6,732 |
| Recovery (APW) ($54,288 × 55.47%) | 30,114 |
| Total Recovery (HP and APW) | $ 36,846 |

Applying the same methodology to projects numbers 139, 139–A and 139–B, the court finds that the federal recovery amount for those projects is $1,396,934. This was computed as follows:

Project Numbers—139, 139–A & 139–B

| | | |
|---|---|---|
| (1) Total Cost of Project | $1,897,919 | |
| (2) Eligible projects costs (fraction—99.33%) | | $1,885,284 |
| (3) Federal share of grants (amount of grants) | | 999,609 |
| (4) Federal participation percentage | | 53.02% |
| (5) Major movable equipment purchase date (11/69) | | 203,686 |

Projects were for an addition and remodeling of the hospital

Depreciation factors—

Addition project: 30 years useful life × 12 months = 360 months
Months in use = 5/70 to 2/82 = 141 months

Depreciation factor—addition $\frac{141}{360}$ mos. 39.17%

Remodeling project: 20 years useful live × 12 months = 240 months
Months in use: 5/70 to 2/82 = 141 months

Depreciation factor—remodeling—$\frac{141}{240}$ mos. = 58.75%

Recovery Computation—Addition

| | |
|---|---|
| (1) Reproduction cost (52,147 sq ft × $79.67 per sq ft) | $4,154,551 |
| (2) Reproduction cost of fraction (99.33% × $4,154,551) | 4,126,716 |
| (3) Depreciation (39.17% × $4,126,716) | 1,616,435 |
| (4) Then value of projects ($4,126,716 − 1,616,435) | 2,510,281 |
| (5) Recovery amount ($2,510,281 × 53.02%) Fed.Participation | 1,330,951 |

Recovery Computation—Remodeling

| | |
|---|---|
| (1) Reproduction cost (3,812 sq ft × $79.67 per sq ft) | 303,702 |
| (2) Reproduction cost of fraction (99.33% × $303,702) | 301,698 |
| (3) Depreciation ($301,698 × 58.75%) | 177,248 |
| (4) Then value of projects ($301,698 − 177,248) | 124,450 |
| (5) Recovery amount ($124,450 × 53.02%) Fed.Participation | 65,983 |

Recapitulation of Recovery Amount
Project Nos. 139, 139–A and 139–B

Building:
| | |
|---|---|
| Addition | $1,330,951 |
| Remodeling | 65,983 |

Total Recovery Amount—Addition and Remodeling      $1,396,934
(Project Nos. 139, 139–A and 139–B)

The Index Method for major movable equipment computation reflects that HHS is entitled to an additional $5,608. This was computed as follows:

| Percentage | Index | Amount | Reproduction Costs |
|---|---|---|---|
| | | | $203,686 |
| 1969 (11/69) 5.37 × 2/12 = | .9 | 1,833 | 205,519 |
| 1969–81 | | | |
| $205,519 × 2.48 Cost Income factor | | | 509,687 |
| 1981—Annual average = $\frac{272.4}{109.8}$ = 2.48 | | | |
| 1969—Annual average | | | |
| 1982    .45% as of 2/2/82 | | 2,294 | 511,981 |

Months in use (5/70 to 2/82) = $\frac{141}{144}$ = 97.92%
12 years useful life

| | |
|---|---|
| (1) Reproduction cost | 511,981 |
| (2) Reproduction cost of fraction (99.33% × $511,981) | 508,551 |
| (3) Depreciation (97.92% × $508,551) | 497,973 |
| (4) Then value of projects ($508,551 – $497,973) | 10,578 |
| (5) Recovery amount ($10,578 × 53.02%) Major Movable Equipment | 5,608 |

 Therefore, HHS is entitled to a total project recovery of $1,439,388.00. Obviously, because the initial construction grant (ARK–21) in the amount of $321,214.85 was executed more than 20 years prior to the Humana lease, HHS is not entitled to a recovery based upon that grant.

A judgment in accordance with the above will be concurrently entered.